UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| |
|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE FACEBOOK ACCOUNT WITH USER ID 100000704147800, WHICH IS MAINTAINED AT PREMISES CONTROLLED BY FACEBOOK, INC., AND THE GMAIL ACCOUNTS ABDIMADOOBE1@GMAIL.COM AND ABDIMADOOBE3@GMAIL.COM, WHICH ARE MAINTAINED AT PREMISES CONTROLLED BY GOOGLE, INC. |

**APPLICATION FOR A SEARCH WARRANT FOR INFORMATION IN POSSESSION OF PROVIDERS**

Case No. 19 MJ 273

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, ELISABETH MURTHA, a Special Agent with the Federal Bureau of Investigation ("FBI"), being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.       I make this affidavit in support of an application for a search warrant pursuant to 18 U.S.C. § 2703 for all content and other information associated with the Facebook account with User ID 100000704147800 ("**Subject Account-1**"), which is maintained and controlled by Facebook, Inc. ("Facebook"); and the Gmail accounts abdimadoobe1@gmail.com ("**Subject Account-2**") and abdimadoobe3@gmail.com ("**Subject Account-3**," and, together with **Subject Account-1** and **Subject Account-2**, the "**Subject Accounts**"), which are maintained and controlled by Google, Inc. ("Google," and, together with Facebook, the "Providers").  The information to be searched is described in the following paragraphs and in Attachments A1 and A2 to the proposed warrants.

2.      I am a Special Agent with the FBI and I am one of the case agents with primary responsibility for this investigation.  I have been employed by the FBI since 2016.  During that time, I have participated in numerous investigations of kidnapping, hostage-taking, and other violent offenses.  Through my participation in those investigations, and my training and experience, I have become familiar with some of the ways in which kidnappers and hostage-takers use the Internet and social media.  I have also participated in the execution of numerous search warrants, including those related to social media and networking sites, and have reviewed digital evidence recovered pursuant to such search warrants.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is , there is probable cause to believe that the **Subject Accounts** contain evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 1201(a)(1) (use of foreign commerce in furtherance of kidnapping), 1201(c) (conspiracy to use foreign commerce in furtherance of kidnapping), 1203(a) (hostage taking), 1203(b)(1) (hostage-taking conspiracy), 924(c) (possession of a firearm in furtherance of a crime of violence), and 924(o) (conspiracy to possess a firearm in furtherance of a crime of violence) (collectively the "Subject Offenses").  On or about February 20, 2019, a Grand Jury sitting in this district returned a superseding indictment charging MOHAMED TAHLIL MOHAMED and ABDI YUSUF HASSAN—who, as set forth below, appears to be the **Subject Accounts**' user—with the Subject Offenses (the "Superseding

Indictment").  A copy of the Superseding Indictment is attached hereto as Exhibit A and incorporated by reference herein.

## PROBABLE CAUSE

### A.  The Michael Scott Moore Kidnapping

5.      This application is submitted in connection with the investigation of the kidnapping of Michael Scott Moore ("Moore"), a journalist who is a citizen of the United States and Germany. Based on my participation in this investigation, including my review of recorded proof of life videos and telephone calls, as well as my conversations with Moore, I know that on or about January 21, 2012, Moore was taken hostage in the vicinity of Galkayo, Somalia, where he had traveled to conduct research for a potential book on Somali piracy.  Armed Somali pirates held Moore hostage in Somalia for nearly three years, releasing him on or about September 23, 2014, following the payment of a ransom.

6.      Based on my conversations with Moore, as well as my conversations with other law enforcement agents and my review of reports written by other law enforcement agents describing their interviews of and conversations with Moore, I have learned the following:

a.      On or about January 21, 2012, multiple Somali men carrying firearms kidnapped Moore.  During the kidnapping, the Somali men smashed Moore's wrist multiple times with their weapons, breaking his wrist, and also stuck him in the head with a firearm, causing hemorrhaging and the loss of his glasses.

b.      Over the ensuing years, Moore was held hostage at a number of locations in and around Somalia, including the Somali wilderness, a ship, and multiple residences in Galkayo, Somalia.  Moore was guarded by Somali men carrying firearms—including, at various points, handguns, automatic weapons, and rocket propelled grenades.

3

c.      On at least one occasion, Moore observed his captors beating another hostage, who was tied up and hung by his ankles from a tree.  At that time, one of Moore's captors threatened to do the same to Moore if Moore's loved ones did not promptly pay a ransom.

d.      One of the individuals who held Moore hostage was a man whom Moore knew by the name "Hassan."  Moore described "Hassan" as a senior figure among the guards who were detaining him, and as someone who described himself as affiliated with the local government in the Galmudug province of Somalia where Moore was being held.  Moore has identified a known photograph of ABDI YUSUF HASSAN, the defendant, as the man he knew as "Hassan."  Moore has also identified MOHAMED TAHLIL MOHAMED as another one of the individuals who held Moore hostage.

e.      Moore was finally released in September 2014.

**B.  The Subject Accounts**

7.      Based on my participation in the investigation, review of documents, and conversations with other law enforcement officers, I have learned, among other things, that on or about February 5, 2019, FBI agents collected a screenshot of the public profile of **Subject Account-1**, which includes the profile picture of **Subject Account-1**'s user.  Based on my comparison of the profile picture of the user of **Subject Account-1** with my personal observations of ABDI YUSUF HASSAN, the defendant, at or about the time of his arrest, *see infra* ¶ 9, it appears that HASSAN is the user of **Subject Account-1**.

8.      On or about July 3, 2018, United States Magistrate Judge Ona T. Wang of the Southern District of New York signed a search warrant for the contents of a Facebook account used by MOHAMED TAHLIL MOHAMED (the "Tahlil Account").  Based on my review of the contents of the Tahlil Account, I have learned, among other things, that:

4

a.      In or about November 2014, TAHLIL, using the Tahlil Account, sent Moore a message, which read: "How are you Michael.  I am ur friend Mohammed Tahlil.  I wants to speak with u.  I am at Hobyo.  I hope u are fine.  The pirates who held u hostage killed each other over group vendetta and money issues."[1]

b.      Starting in November 2014, TAHLIL, using the Tahlil Account, sent Moore a number of photographs of individuals.  Both Moore and TAHLIL identified some of those photographs as depicting individuals who had held Moore captive.  At least some of these photographs appeared to have been retrieved from other Facebook accounts.

c.      TAHLIL, using the Tahlil Account, has also sent Moore written descriptions of some of the individuals involved in Moore's kidnapping.  For instance, TAHLIL described one such individual as the "man the first your jounery in hobyo when you want to take pictur he refused amd he fighting wedh you by gun and he is long man very strong."

d.      On or about March 25, 2015, TAHLIL used the Tahlil Account to send a Facebook "friend request" to **Subject Account-1.**  HASSAN, the user of **Subject Account-1**, accepted the request the same day.

e.      The Tahlil Account and **Subject Account-1** appear to have communicated directly a number of times through a variety of means, including Voice Over Internet Protocol ("VOIP") calls and direct messages.  **Subject Account-1** and the Tahlil Account placed or attempted to place 7 VOIP calls to one another, and exchanged over 60 direct messages.

f.      The vast majority of the direct messages between TAHLIL and HASSAN are in Somali.  However, on at least one occasion, HASSAN responded partly in English to a post

---

[1] According to news reports I have read, several of Moore's captors apparently killed each other in a dispute over how to divide Moore's ransom.

5

by TAHLIL.  TAHLIL posted a photograph of himself wearing what appears to be a military uniform, to which HASSAN responded, using **Subject Account-1**, "Congratulations my bro this is amazing good jobs," before concluding his post with text in Somali.

g.      In several of the messages sent by TAHLIL to **Subject Account-1,** TAHLIL referred to HASSAN with the Somali word "wasiir," which I understand translates to "Minister."

h.      Based on the fact that **Subject Account-1** appears to contain communications between indicted co-conspirators, which will serve both as independent evidence of the Subject Offenses and will corroborate HASSAN's relationship with other individuals involved in Moore being held hostage, *see infra* ¶ 9(b), it appears likely that **Subject Account-1** will contain evidence of the Subject Offenses.

9.      On or about February 15, 2019, HASSAN was arrested in Minneapolis, Minnesota, and was subsequently interviewed by FBI agents, after having been advised of his rights.  Based on my participation in that arrest and that interview and my conversations with other law enforcement agents who were involved, I know, among other things, the following:

a.      When HASSAN was arrested, he was carrying a business card bearing his name, "ABDI YUSUF HASSAN," and identifying himself as the Minister of Interior and Security for Galmudug State of Somalia.[2]  The business card identified his email address as **Subject Account-2.**  The business card also identified a phone number with a Somali country code as HASSAN's phone number (the "Hassan Phone Number").

---

[2] U.S. authorities are unable at this time to verify whether, in fact, HASSAN held any actual office with the Government of Somalia.

6

i.      As noted above, HASSAN's role within the Galmudug government was a position that he promoted to Moore during his communications with Moore while Moore was being held hostage, *see supra* ¶ 6(d).   HASSAN's government position was similarly something that was known to his co-conspirators, including TAHLIL, *see supra* ¶ 8(g). Accordingly, it appears that HASSAN may have undertaken some of his role as a leader of Moore's kidnappers based, in part, on his official position.

ii.      Because HASSAN included **Subject Account-2** on his official business card, it appears that this was an account that HASSAN used to conduct business in his role as a "minister" in Galmudug state.

b.      During his post-arrest statement, HASSAN claimed that he did not know MOHAMED TAHLIL MOHAMED and stated that he had never heard that name.  This statement appears to be false, based on HASSAN's extensive communications with TAHLIL through **Subject Account-1**, *see supra* ¶ 8(d)-(g), including TAHLIL's specific reference to HASSAN as "minister," the title claimed by HASSAN on his business card**.**

c.      HASSAN also claimed never to have met Moore.  This statement also appears to be false, based on Moore's identification of a known photograph of HASSAN as one of his captors, *see supra* ¶ 6(d).

10.      Based on my review of records provided by Facebook regarding **Subject Account-1**, I have learned, among other things, the following:

a.      One of the phone numbers listed as "verified" for **Subject Account-1** is the Hassan Phone Number.

b.      **Subject Account-3** is the registered email account, or registration email, for **Subject Account-1.**

7

c.      **Subject Account-1** was created on February 2, 2010, well before Moore's kidnapping began.  Based on my training and experience, users of social media frequently use their social media accounts as repositories and archives of various forms of digital communications and content, including registration information, messages, and photos.  Accordingly, it is likely that materials related to the Subject Offenses (including the above-described communications) are still located in **Subject Account-1**.

11.      Based on my training and experience, my participation in this investigation and others, my conversations with other law enforcement agents and others, and my review of records produced by Facebook and Google, I respectfully submit that because **Subject Account-3** is the registration email for **Subject Account-1**, there is probable cause to believe that **Subject Account-3** contains evidence of criminal activity, including the following:

a.      Because **Subject Account-3** is the registration email for **Subject Account-1**, **Subject Account-3** likely contains evidence concerning the creation and maintenance of **Subject Account-1**.  For example, **Subject Account-3** likely contains email communications demonstrating when **Subject Account-1** was created, if and when the password for **Subject Account-1** was changed, and when **Subject Account-1** received a message.

b.      Moreover, because a user uses the registered email address to maintain his or her Facebook account, including to, for example, reset the password, the same individual likely used a specific Facebook account and its related Gmail account.  For example, because HASSAN used **Subject Account-1**, and because **Subject Account-3** is the registration email for **Subject Account-1** and thus involved in the maintenance of **Subject Account-1**, HASSAN also likely used **Subject Account-3**.  Thus, emails in registration Gmail accounts that demonstrate who uses those

8

accounts, such as personal emails, are also evidence of the users of the respective Facebook accounts.

12.     Similarly, because **Subject Account-2** appears to have been used by HASSAN as a business account in his role with the Ministry of Interior and Security in Galmudug, Somalia, **Subject Account-2** likely contains communications relevant to his dealings with activity occurring in that territory pertaining to, among other things, security, which would include Moore's kidnapping. As noted above, *see supra* ¶ 9(a)(i), HASSAN appears to have invoked his purported government position both with Moore and with his co-conspirators, including TAHLIL, further demonstrating that his position was integrally connected with his role in Moore being held hostage. Based on my training and experience, I know that individuals typically use email accounts such as **Subject Account-2** as repositories for old emails about their various dealings. This is particularly so when, as here with regard to **Subject Account-2**, email accounts are used for business purposes; this is so at least in part because the email communications set forth various agreements, contact information, and other details that are important to preserve in order to retain access to the information. Moreover, once an individual establishes an email account for business purposes, he or she continues to use the account for those purposes; this is so at least in part because business associates often use emails to contact each other—just as a business would not choose to frequently change its telephone number, so it is with email accounts. Accordingly, I respectfully submit that the facts set forth in this paragraph further buttress the conclusion that evidence, fruits, and instrumentalities of the Subject Offenses will be in **Subject Account-2**.

13.     Based upon my familiarity with this and other investigations of crimes such as the Subject Offenses, including my discussions with law enforcement officials and my review of legal documents involving online social networking sites and email services, I know that information

concerning email contacts, group memberships, and patterns of electronic communications with individuals associated with the subject of an criminal investigation involving the **Subject Accounts** are likely to provide evidence that is relevant and material to determining that subject's social networks, contacts, travel, and potential knowledge of or involvement in a criminal act. Specifically, source and destination addresses of electronic messages, including the "To:" "Cc:" and "Bcc:" (destinations), and "From:" (source) for all electronic communications sent from or received by the Subject Account are likely to provide useful information about other individuals that have had contact with the Target Subjects regarding the Subject Offenses.

14.     Finally, Google also maintains certain location information about email accounts it maintains, *see infra* ¶ 36(m).   Location information about **Subject Account-2** and **Subject Account-3** would also be evidence of the Subject Offenses in that it could show, for example, where **Subject Account-2** and **Subject Account-3** were created or help to co-locate the user of the **Subject Accounts** with other co-conspirators or other relevant events in the planning and execution of Moore's kidnapping and captivity.   For example, geolocation information about **Subject Account-2** and **Subject Account-3** could help to identify where HASSAN and Moore met, corroborating Moore's identification of HASSAN.

## BACKGROUND CONCERNING FACEBOOK

15.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

16.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

17.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

18.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

19.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their

11

whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

20.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video.  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

21.     Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook.  These chat communications are stored in the chat history for the

account.  Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

22.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

23.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

24.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

25.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

26.     Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

27.     The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page.  Gifts cost money to purchase, and a personalized message can be attached to each gift.  Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

28.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

29.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

30.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile.  The "Neoprint" for a given user can include the following information from the user's profile:  profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

31.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

32.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the

14

service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

33.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.  Further, Facebook account activity can show how and when the account was accessed or used.  For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.  Additionally,

15

Facebook builds geo-location into some of its services.  Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other.  This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation.  For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

34.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## BACKGROUND CONCERNING EMAIL

35.     In my training and experience, I have learned that Google provides a variety of on-line services, including electronic mail ("email") access, to the public.  Google allows subscribers to obtain email accounts at the domain name "gmail.com", like **Subject Account-2** and **Subject Account-3**.  Subscribers obtain an account by registering with Google.  During the registration process, Google asks subscribers to provide basic personal information.  Therefore, the computers of Google are likely to contain stored electronic communications (including retrieved and unretrieved email for Google subscribers) and information concerning subscribers and their use of Google services, such as account access information, email transaction information and account application information.  In my training and experience, such

16

information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

36.     A Google subscriber can also store with the provider files in addition to emails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to emails), and other files, on servers maintained and/or owned by Google.  The information available from Google may include the following:

a.     *Address Book*: Google also allows subscribers to maintain the equivalent of an address book, comprising email addresses and other contact information of other email users.

b.     *Subscriber and Billing Information*: Google collects and maintains (typically unverified) identifying information about each subscriber, including, for example, name, username, address, telephone number, and alternate email addresses.  Google also maintains records concerning the date on which the account was created, the IP address of the user at the time of account creation, the current status of the account (*e.g.*, active or closed), the length of service, and the types of services used by the subscriber.  Additionally, for paying subscribers, Google maintains records of the subscriber's means and source of payment, including any credit card or bank account number.

c.     *Transactional Information*: Google also typically retain certain transactional information about the use of each account on its system.  This information can include records of login (*i.e.*, session) times and durations and the methods used to connect to the account (such as logging into the account through Google's websites).

d.     *Search History*: Google also typically record searches done by a user of an account through their search engines.

17

e.     *Cookie Data*: Google also typically maintain records of "cookies" that they use to track information about the user of an account, including, for example, websites visited.

f.     *Customer Correspondence*: Google also typically maintain records of any customer service contacts with or about the subscriber, including any inquiries or complaints concerning the subscriber's account.

g.     *Preserved Records*: Google also maintains preserved copies of the foregoing categories of records with respect to an account, for at least 90 days, upon receiving a preservation request from the Government pursuant to Section 2703(f).

h.     *Google Drive Content*: Google provides users with a certain amount of free "cloud" storage, currently 15 gigabytes, through a service called "Google Drive" (users can purchase a storage plan through Google to store additional content).  Users can purchase enhanced storage capacity for an additional monthly fee.  Users can use their Google Drive to store email, attachments, videos, photographs, documents, and other content "in the cloud," *i.e.*, online.  A user can access content stored on Google Drive by logging into his or her Google account through any computer or other electronic device connected to the Internet.  Users can also share files stored on Google Drive with others, allowing them to view, comment, and/or edit the files.

i.     *Google Docs*: Google provides users with the ability to write, edit, and collaborate on various documents with other Google users through a service called "Google Docs." Users can use Google Docs to create online documents that can be stored on or saved to the user's Google Drive.

j.     *Google Photos*: Google provides users with a certain amount of free storage for photographs, through a service called Google Photos, which allows users to manually store photographs and videos, and which automatically uploads photographs and videos taken by

18

registered mobile devices.  Google also retains the metadata—or data that provides information about the data in question, such as the time and date of creation, the author or creator, the means of its creation, the purpose of the data, among other data—for photos and videos uploaded to Google, including to Google Photos.  This metadata includes what is known as exchangeable image file format (or "Exif") data, and can include GPS location information for where a photo or video was taken.

        k.    *Google Calendar*: Google provides users with an online calendar, in which they can add appointments, events, and reminders, that is synchronized across registered computers and mobile devices.  Users can share their calendars with other users, allowing the maintenance of joint calendars.

        l.    *Google Chats and Google Hangouts Content*: Google allows subscribers to engage in "chat" sessions in an instant-messaging format with other Google users, the transcripts of which are generally stored in a user's email content.  Similarly, Google allows users to engage in enhanced chat sessions, called Hangouts, which permit the sharing of additional content such as videos, sounds, and images.  In general, Hangouts content is stored separately from a user's email and chat content.

        m.    *Location History Data*: Google maintains recent location data, collected periodically, from mobile devices that are logged into or have used applications (or "apps") or services provided by Google.  For example, Google collects information collected from GPS, WiFi networks, cell site locations, and mobile networks to estimate a user's location.  Google apps and services also allow for location reporting, which allows Google to periodically store and use a device's most recent location data in connection with a Google account.

n.  *Google Payments*: Google allows for the storage of payment information associated with a Google account, including credit cards and bank accounts, and contains information about all transactions made with a Google account, allowing for the payment for goods (such as those purchased through Google Shopping) and bills, among other features.

o.  *Google+*: Google hosts an Internet-based social network.  Among other things, users can post photos and status updates and group different types of relationships (rather than simply "friends") into Circles.  In addition, Google has a service called PlusOne, in which Google recommends links and posts that may be of interest to the account, based in part on accounts in the user's Circle having previously clicked "+1" next to the post.  PlusOne information therefore provides information about the user of a given account, based on activity by other individuals the user has entered in the user's Circle.

p.  *Google Voice*: Google provides a telephone service that provides call forwarding and voicemail services, voice and text messaging.

37.    In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account.  Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses and, for paying subscribers, means and source of payment (including any credit or bank account number).  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  Based on my training and my experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

38.     In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems.  This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

39.     In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

40.     As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, the

21

information stored in connection with an email account can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time.  Further, information maintained by the email provider can show how and when the account was accessed or used.  For example, as described below, email providers typically log the IP addresses from which users access the email account, along with the time and date of that access.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation.  This geographic and timeline information may tend to either inculpate or exculpate the account owner.  Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via email).  Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation.  For example, information in the email account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

## **INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

41.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant

to require Facebook and Google to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachments B1 and B2.  Upon receipt of the information described in Section I of Attachments B1 and B2, government-authorized persons will review that information to locate the items described in Section II of Attachments B1 and B2.

## **CONCLUSION**

42.     Based on the forgoing, I request that the Court issue the proposed search warrant.

43.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

44.      Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.


Respectfully submitted ,

S/ Elisabeth Murtha
_____

ELISABETH MURTHA
Special Agent
Federal Bureau of Investigation


Subscribed and sworn to before me on ____3/27_____, 201_9__



____S/ Lois Bloom_____
Honorable Lois Bloom
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

23

RMT:SME/DWD
F. #2018R02136

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ FEB 20 2019 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

MOHAMED TAHLIL MOHAMED,
    also known as "Tahlil Mohamed,"
    "Mohamed Tahlil," "Maxamed
    Tahliil Guure," "the Taliye" and
    "Mohamed the Taliye," and
ABDI YUSUF HASSAN,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

SUPERSEDING
INDICTMENT

Cr. No. 18-603 (S-1) (ARR)
(T. 18, U.S.C., §§ 924(c)(1)(A)(i),
924(c)(1)(A)(ii), 924(c)(1)(A)(iii),
924(c)(1)(B)(ii), 924(o), 981(a)(1)(C),
1201(a)(1), 1201(c), 1203(a),
1203(b)(1), 3238, 2 and 3551 et seq.; T.
21, U.S.C., § 853(p); T. 28, U.S.C., §
2461(c))

THE GRAND JURY CHARGES:

COUNT ONE<br>(Kidnapping Conspiracy)

      1.     In or about and between January 2012 and September 2014, both dates

being approximate and inclusive, in an offense begun and committed in Somalia and

elsewhere out of the jurisdiction of any particular State or district of the United States, the

defendants MOHAMED TAHLIL MOHAMED, also known as "Tahlil Mohamed,"

"Mohamed Tahlil," "Maxamed Tahliil Guure," "the Taliye" and "Mohamed the Taliye,"

who, after the conduct required for this offense occurred, was first brought to and found in

the Eastern District of New York, and ABDI YUSUF HASSAN, together with others, did

knowingly and intentionally conspire to seize, confine, inveigle, decoy, kidnap, abduct and

carry away and hold, for ransom and reward and otherwise, a person, to wit: John Doe, an

individual who is a dual citizen of the United States and another country and whose identity

is known to the Grand Jury, and to use one or more means, facilities and instrumentalities of

interstate and foreign commerce, to wit: cellular telephones, in committing and in furtherance

of the commission of the offense, contrary to Title 18, United States Code, Section

1201(a)(1).

2.     In furtherance of the conspiracy and to effect its objects, the defendants

did commit and cause to be committed, among others, the following:

### Overt Acts

(a)     On or about January 21, 2012, several co-conspirators not

named as defendants herein abducted John Doe in Galkayo, Somalia.

(b)     In or about February 2012, MOHAMED arrived at the

encampment where John Doe was being held in the vicinity of Hobyo, Somalia.

(c)     In or about and between February 2012 and April 2012,

MOHAMED issued directions to guards armed with automatic rifles and handguns and

holding John Doe captive.

(d)     In or about early March 2012, MOHAMED, while carrying an

automatic rifle, helped transport John Doe from one location to another.

(e)     In or about May 2012, while MOHAMED's and HASSAN's co-

conspirators held John Doe hostage on board a hijacked vessel off the coast of Somalia,

MOHAMED boarded the vessel.

(f)     In or about April 2014, MOHAMED's and HASSAN's co-

conspirators moved John Doe to a house in the vicinity of Galkayo, Somalia, where HASSAN

was present.

(g) In or about early April 2014, HASSAN instructed John Doe to place a phone call to an individual located in the United States in order to secure a larger ransom payment for John Doe's release.

(h) In or about May 2014, HASSAN instructed John Doe to make a recording in order to secure a ransom payment for John Doe's release, which John Doe then did in HASSAN's presence.

(Title 18, United States Code, Sections 1201(c), 3238 and 3551 et seq.)

## COUNT TWO
### (Kidnapping)

3. In or about and between January 2012 and September 2014, both dates being approximate and inclusive, in an offense begun and committed in Somalia and elsewhere out of the jurisdiction of any particular State or district of the United States, the defendants MOHAMED TAHLIL MOHAMED, also known as "Tahlil Mohamed," "Mohamed Tahlil," "Maxamed Tahliil Guure," "the Taliye" and "Mohamed the Taliye," who, after the conduct required for the offense occurred, was first brought to and found in the Eastern District of New York, and ABDI YUSUF HASSAN, together with others, did knowingly and intentionally seize, confine, inveigle, decoy, kidnap, abduct and carry away and hold, for ransom and reward and otherwise, a person, to wit: John Doe, and use one or more means, facilities and instrumentalities of interstate and foreign commerce, to wit: cellular telephones, in committing and in furtherance of the commission of the offense.

(Title 18, United States Code, Sections 1201(a)(1), 3238, 2 and 3551 et seq.)

## COUNT THREE
(Hostage-Taking Conspiracy)

4.      In or about and between January 2012 and September 2014, both dates

being approximate and inclusive, in an offense begun and committed in Somalia and

elsewhere out of the jurisdiction of any particular State or district of the United States, the

defendants MOHAMED TAHLIL MOHAMED, also known as "Tahlil Mohamed,"

"Mohamed Tahlil," "Maxamed Tahliil Guure," "the Taliye" and "Mohamed the Taliye,"

who, after the conduct required for the offense occurred, was first brought to and found in the

Eastern District of New York, and ABDI YUSUF HASSAN, together with others, did

knowingly and intentionally conspire to seize and detain and threaten to kill, injure and

continue to detain a person, to wit: John Doe, in order to compel a third person to do an act,

to wit: to pay a sum of United States currency, as an explicit and implicit condition for the

release of the person seized and detained.

(Title 18, United States Code, Sections 1203(a), 1203(b)(1), 3238 and 3551 et

seq.)

## COUNT FOUR
(Hostage Taking)

5.      In or about and between January 2012 and September 2014, both dates

being approximate and inclusive, in an offense begun and committed in Somalia and

elsewhere out of the jurisdiction of any particular State or district of the United States, the

defendants MOHAMED TAHLIL MOHAMED, also known as "Tahlil Mohamed,"

"Mohamed Tahlil," "Maxamed Tahliil Guure," "the Taliye" and "Mohamed the Taliye,"

who, after the conduct required for the offense occurred, was first brought to and found in the

Eastern District of New York, and ABDI YUSUF HASSAN, together with others, did

knowingly and intentionally seize and detain, and threaten to kill, injure and continue to

detain a person, to wit: John Doe, in order to compel a third person to do an act, to wit: to

pay a sum of United States currency, as an explicit and implicit condition for the release of

the person seized and detained.

(Title 18, United States Code, Sections 1203(a), 1203(b)(1), 3238, 2 and 3551

et seq.)

COUNT FIVE
(Unlawful Use of Firearms)

6.      In or about and between January 2012 and September 2014, both dates

being approximate and inclusive, in an offense begun and committed in Somalia and

elsewhere out of the jurisdiction of any particular State or district of the United States, the

defendants MOHAMED TAHLIL MOHAMED, also known as "Tahlil Mohamed,"

"Mohamed Tahlil," "Maxamed Tahliil Guure," "the Taliye" and "Mohamed the Taliye,"

who, after the conduct required for the offense occurred, was first brought to and found in the

Eastern District of New York, and ABDI YUSUF HASSAN, together with others, did

knowingly and intentionally use and carry one or more firearms during and in relation to one

or more crimes of violence, to wit: the crimes charged in Counts One through Four, and did

knowingly and intentionally possess such firearms in furtherance of said crimes of violence,

one or more of which firearms was brandished and discharged, and one or more of which firearms was a machinegun and a destructive device.

(Title 18, United States Code, Sections 924(c)(1)(A)(i), 924(c)(1)(A)(ii), 924(c)(1)(A)(iii), 924(c)(1)(B)(ii), 3238, 2 and 3551 et seq.)

COUNT SIX<br>(Firearms Conspiracy)

7.      In or about and between January 2012 and September 2014, both dates being approximate and inclusive, in an offense begun and committed in Somalia and elsewhere out of the jurisdiction of any particular State or district of the United States, the defendants MOHAMED TAHLIL MOHAMED, also known as "Tahlil Mohamed," "Mohamed Tahlil," "Maxamed Tahliil Guure," "the Taliye" and "Mohamed the Taliye," who, after the conduct required for the offense occurred, was first brought to and found in the Eastern District of New York, and ABDI YUSUF HASSAN, together with others, did knowingly and intentionally conspire to use and carry one or more firearms during and in relation to one or more crimes of violence, to wit: the crimes charged in Counts One through Four, and to possess such firearms in furtherance of said crimes of violence, one or more of which firearms was a machinegun and a destructive device.

(Title 18, United States Code, Sections 924(o), 3238 and 3551 et seq.)

CRIMINAL FORFEITURE ALLEGATION

8.      The United States hereby gives notice to the defendants that, upon their conviction of any of the offenses charged in Counts One through Four, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such

offenses to forfeit any property, real or personal, constituting, or derived from, proceeds

obtained directly or indirectly as a result of such offenses, including but not limited to a sum

of money representing the amount of proceeds obtained as a result of the offenses.

        9.     If any of the above-described forfeitable property, as a result of any act

or omission of the defendants:

        (a)     cannot be located upon the exercise of due diligence;

        (b)     has been transferred or sold to, or deposited with, a third party;

        (c)     has been placed beyond the jurisdiction of the court;

        (d)     has been substantially diminished in value; or

        (e)     has been commingled with other property which cannot be

divided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p),

to seek forfeiture of any other property of the defendants up to the value of the forfeitable

property described in this forfeiture allegation.

        (Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States

Code, Section 853(p); Title 28, United States Code, Section 2461(c))

A TRUE BILL

_____
FOREPERSON

BY: _____
ACTING UNITED STATES ATTORNEY
PURSUANT TO 28 C.F.R. 0.136

_____
RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

F.#:2018R02136
FORM DBD-34
JUN. 85

No. 18-CR-603 (S-1) (ARR)

# UNITED STATES DISTRICT COURT

EASTERN *District of* NEW YORK

CRIMINAL DIVISION

## THE UNITED STATES OF AMERICA

*vs.*

MOHAMED TAHLIL MOHAMED, *also known as "Tahlil Mohamed," "Mohamed Tahlil," "Maxamed Tahliil Guure," "the Taliye" and "Mohamed the Taliye," and ABDI YUSUF HASSAN,*

Defendants.

## SUPERSEDING INDICTMENT

(T. 18, U.S.C., §§ 924(c)(1)(A)(i), 924(c)(1)(A)(ii), 924(c)(1)(A)(iii), 924(c)(1)(B)(ii), 924(o), 981(a)(1)(C), 1201(a)(1), 1201(c), 1203(a), 1203(b)(1), 3238, 2 and 3551 et seq.; T. 21, U.S.C., § 853(p); T. 28, U.S.C., § 2461(c))

*A true bill.*

_____ *Foreperson.*

*Filed in open court this* _____ *day, of* _____ *A.D. 20___*

_____ *Clerk*

*Bail, $* _____

*David W. Denton, Jr., Special Assistant U.S. Attorney, 212-637-2744*

## ATTACHMENT A1 (Facebook)

### Property to Be Searched

This warrant applies to information associated with the Facebook user ID 100000704147800 that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B1 (Facebook)

### Particular Things to be Seized

**I.      Information to be disclosed by Facebook**

To the extent that the information described in Attachment A1 is within the possession, custody, or control of Facebook Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A1:

a.   All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

b.   All activity logs for the Subject Account and all other documents showing the user's posts and other Facebook activities;

c.   All photos and videos—and all associated metadata—uploaded by the user of the Subject Account and all photos and videos uploaded—and all associated metadata—by any user that have that user tagged in them;

d.   All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

e.   All other records of communications and messages made or received by the user—and all associated metadata—including all private messages, chat history, video calling history, and pending "Friend" requests;

f.   All "check ins" and other user-provided location information;

g.   Any location history, last known location, or other GPS or latitude-longitude data for any Subject Account;

h.   All IP logs, including all records of the IP addresses that logged into the Subject Account;

i.   All records of the Subject Account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

j.   All information about the Facebook pages that the Subject Account are or were a "fan" of;

k.   All past and present lists of friends created by the Subject Account;

l.   All records of Facebook searches performed by the Subject Account;

m.   All information about access and use of Facebook Marketplace by the user of the Subject Account;

n.   The types of service utilized by the user(s) of the Subject Account;

o.   The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

p.   All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

2

q.  All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

r.  All push tokens or other similar identifiers.

s.  Any and all cookies associated with or used by any computer or web browser associated with a Subject Account, including the IP addresses, dates, and times associated with the recognition of any such cookie; and

t.  Any information identifying the device or devices used to access each Subject Account, including a device serial number,  a GUID or Global Unique Identifier, a phone number, MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI"), and any other information regarding the types of devices used to access each Subject Account.

u.  Any preserved copies of any of the foregoing categories of records created in response to any preservation request(s) issued pursuant to 18 U.S.C. § 2703(f).

The Provider is hereby ordered to disclose the above information to the government within 10 days of service of this warrant.

3

## II.     Review of Information by the Government

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate any evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 1201(a)(1) (use of foreign commerce in furtherance of kidnapping), 1201(c) (conspiracy to use foreign commerce in furtherance of kidnapping), 1203(a) (hostage taking), 1203(b)(1) (hostage-taking conspiracy), and 924(c) (possession of a firearm in furtherance of a crime of violence), and 924(o) (conspiracy to possess a firearm in furtherance of a crime of violence) (collectively the "Subject Offenses").

a.      Evidence of communications between and among the individuals who held Michael Scott Moore hostage, including ABDI YUSUF HASSAN and MOHAMED TAHLIL MOHAMED;

b.      Statements by HASSAN related to the kidnapping of Moore and the Subject Offenses;

c.      Photographs and other identification information related to individuals who participated in the kidnapping of Moore;

d.      Evidence that can help establish the identity of the Subject Account's user(s), as well as the identities of any co-conspirators;

e.      Information related to the geographic location of HASSAN and his co-conspirators;

4

       f.      Information related to other digital facilities—including email and other social media accounts—which HASSAN may use to communicate with individuals who participated in Moore's kidnapping; and

       g.      Passwords or other information needed to access the Subject Account's user's computer or other online accounts.

5

## ATTACHMENT A2 (Google)

### Property to Be Searched

This warrant applies to information associated with email accounts

abdimadoobe1@gmail.com and abdimadoobe3@gmail.com, maintained at premises controlled

by Google, Inc., which is headquartered at 1600 Amphitheatre Parkway, Mountain View,

California 94043.

## ATTACHMENT B2 (Google)

### Particular Things to be Seized

**I.      Information to be Disclosed by Google (the "Provider")**

To the extent that the information described in Attachment A2 is within the possession, custody or control of the Provider, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A2:

a.      *Email content.*  All emails sent to or from, stored in draft form in, or otherwise associated with the Subject Accounts, including all message content, attachments, and header information (specifically including the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email);

b.      *Subscriber and payment information.*  All subscriber and payment information regarding the Subject Accounts, including but not limited to name, username, address, telephone number, alternate email addresses, registration IP address, account creation date, account status, length of service, types of services utilized, means and source of payment, and payment history.

c.      *Address book information.*  All address book, contact list, or similar information associated with the Subject Accounts.

d.      *Videos.*  All videos uploaded by the user of the Subject Accounts, whether publicly displayed or not, and all associated metadata.

e. *Playlists and Channels*.  All playlists, channels followed, discussions, and postings, whether public or private, and all associated metadata, relating to the Subject Accounts.

f. *Transactional records*.  All transactional records associated with the Subject Accounts, including any IP logs or other records of session times and durations.

g. *Search History*: All search history associated with the Subject Accounts.

h. *Cookies*: Any and all cookies associated with or used by any computer or web browser associated with the Subject Accounts, including the IP addresses, dates, and times associated with the recognition of any such cookie.

i. *Push token data:* Any and all push token data, associated with the Subject Accounts, as well as all devices (telephones, tablets, desktop computers, laptop computers, or any other device associated with the account), including make, model, international mobile equipment (IMEI) number(s), mobile equipment identifier(s) (SN), and media access control (MAC) address(es), associated with those push tokens or the Subject Accounts.

j. *Customer correspondence.*  All correspondence with the subscriber or others associated with the Subject Accounts, including complaints, inquiries, or other contacts with support services and records of actions taken.

k. *Location data.*  Any and all location data, including but not limited to location reporting and location history data for the Subject Accounts, including at a minimum location reporting and location history data for a 24-hour period preceding the time of service of this warrant.

l. *User string agent data.*  All user string agent data associated with the Subject Accounts.

m.      *Advertising identifier.*   All advertising identifier information associated with the Subject Accounts.

n.      *Preserved records.*   Any preserved copies of any of the foregoing categories of records created in response to any preservation request(s) issued pursuant to 18 U.S.C. § 2703(f).

The Provider is hereby ordered to disclose the above information to the government within 10 days of service of this warrant.

## II.      Review of Information by the Government

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate any evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 1201(a)(1) (use of foreign commerce in furtherance of kidnapping), 1201(c) (conspiracy to use foreign commerce in furtherance of kidnapping), 1203(a) (hostage taking), 1203(b)(1) (hostage-taking conspiracy), and 924(c) (possession of a firearm in furtherance of a crime of violence), and 924(o) (conspiracy to possess a firearm in furtherance of a crime of violence) (collectively the "Subject Offenses").

a.      Evidence of communications between and among the individuals who held Michael Scott Moore hostage, including ABDI YUSUF HASSAN and MOHAMED TAHLIL MOHAMED;

b.      Statements by HASSAN related to the kidnapping of Moore and the Subject Offenses;

3

c.      Photographs and other identification information related to individuals who participated in the kidnapping of Moore;

d.      Evidence that can help establish the identity of the Subject Account's user(s), as well as the identities of any co-conspirators;

e.      Information related to the geographic location of HASSAN and his co-conspirators;

f.      Information related to other digital facilities—including email and other social media accounts—which HASSAN may use to communicate with individuals who participated in Moore's kidnapping; and

g.      Passwords or other information needed to access the Subject Account's user's computer or other online accounts.